IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMAS P. REAL, )
)
Plaintiff, )
) No. 11 C 4205
v. )
) Magistrate Judge Sidney I. Schenkier
)
MICHAEL J. ASTRUE, Commissioner )
of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, plaintiff, Thomas Real, pursuant to the Social Security Act, 42

U.S.C. § 405(g), seeks an order reversing or remanding the final decision of the Commissioner of

the Social Security Administration ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB") (doc. # 21).[2] The Commissioner has filed a response, seeking to affirm

the denial of benefits (doc. # 22). For the reasons stated below, we grant Mr. Real's motion for

remand and deny the Commissioner's motion to affirm.

I.

Mr. Real applied for DIB with the Commissioner on July 3, 2007, alleging a disability onset

date of June 2, 2007 (R. 177), due to back injury, injuries to both knees, lower back arthritis,

neuropathy, and fibromyalgia (R. 182). He also claims limitations from bipolar disorder and pain

---

[1] On August 23, 2011, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 12, 14).

[2] On September 7, 2011, this Court set a briefing schedule for the parties' cross motions for summary judgment and their supporting memoranda (see docs. ## 15, 17). Although the parties both filed briefs, neither side filed a motion. Consequently, we treat each party's memorandum as a motion for summary judgment (docs. ## 21, 22).

in his left shoulder (doc. # 21: Pl.'s Br. at 3; R. 643, 652-54, 692). Based on his employment history, Mr. Real's date of last insured status was December 31, 2011 (R. 53, 177). His application was denied initially and upon reconsideration (R. 46-47, 67-71, 76-80). He requested a hearing before an Administrative Law Judge ("ALJ"), which was granted and held on November 23, 2009 (R. 81-82, 7-45). On December 9, 2009, the ALJ issued a decision finding that Mr. Real was not disabled under Sections 216(i) and 223(d) of the Social Security Act (the "Act") (R. 51-62). *See* 42 U.S.C. §§ 416(i) & 423(d). The Appeals Council denied Mr. Real's request for review (R. 1-6), making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981. *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the medical record and then proceed to consider the hearing testimony given by Mr. Real and the vocational expert, as well as the ALJ's written decision.

## A.

Mr. Real was born on April 17, 1962, and was forty-seven years old at the time of the hearing (R. 14). He is married and has two young children, aged four and six at the time of the hearing (R. 14-15). Though he went to trade school to be a sprinkler fitter, his most recent job was as a furniture salesman (R. 15-16).

Mr. Real has experienced back pain for many years (R. 268-95, 443, 450). Dr. Vasireddy Bhoopal has been Mr. Real's primary care physician since 2002 (R. 279-95, 299-302, 307, 740-44), and at the beginning of 2006, Mr. Real sought treatment at a pain management center, APAC Groupe Centers for Pain Management ("APAC") (R. 256). Mr. Real's treating physician at APAC, Dr. Timothy King, sought to alleviate his pain with radiofrequency neurotomy in March 2006 and

an intraarticular facet injection at the L4-5 left side in June (R. 269, 271), but Mr. Real's symptoms

did not improve (R. 268). Dr. King referred him to a surgeon, Dr. Howard An (R. 266). On

October 9, 2006, Dr. An diagnosed him with L4-5 foraminal stenosis with axial back pain and

performed a hemilaminotomy, foraminotomy, and fusion at L4-L5 (R. 245-52, 388-98, 612, 642).[3]

Shortly after the surgery, on October 18, 2006, Mr. Real returned to APAC and was seen by Dr.

Krishna Parameswar (R. 625). The treatment notes from that day reflect that when Dr. Parameswar

informed Mr. Real that they could not determine disability without guidance from Dr. An, Mr. Real

was "very rude": "[i]n a very angry manner, [Mr. Real] stood up, slammed the door open, and

stormed out of the room" (*Id.*). Some weeks later, Mr. Real resumed working, but within months,

his pain returned (R. 502, 508, 615).

In April 2007, Dr. King again treated Mr. Real with radiofrequency neurotomy and the next

month gave him an epidural injection (R. 258, 262). But the pain increased, and Mr. Real stopped

working in June 2007 (R. 363, 612). He complained of back pain radiating to his hip, buttock, and

leg (R. 260, 363). The medications he used – Norco, Percocet, Toradol, Baclafen, and Lidoderm,

among others[4] – did not relieve the pain, and he reported not sleeping well (R. 255, 256, 260, 263,

264, 261, 363). The pain caused antalgic gait on several occasions (R. 260, 261, 612), and he

frequently uses a cane to walk (R. 23-24, 192-93, 256, 260, 594, 612, 613, 645).

Mr. Real also suffers from knee and shoulder problems. In 1982, he injured his right knee

and has undergone multiple subsequent surgeries, causing weakness, instability, and pain (R. 332,

---

[3] A laminotomy is the removal of a portion of a vertebral lamina "for the purpose of relieving pressure in a spinal nerve root." STEDMAN'S MEDICAL DICTIONARY 1046 (28th ed. 2006). A foraminotomy is the surgical enlargement of the intervetebral foramen. *Id.* at 759.

[4] The combination and dosage of his medications changed over time, but at the time of his hearing, Mr. Real reported taking Percocet four times per day (R. 20).

642-43). On July 17, 2007, Dr. Daniel Troy, a physician at Midwest Orthopaedic Consultants, observed what he noted as "a questionable failure" of Mr. Real's anterior cruciate ligament ("ACL") gave him a booster cortisone shot to his right knee (R. 332). In August 2007, shortly after receiving a cortisone shot for pain in his left knee, he slipped and injured the left knee again (R. 333). Dr. Troy ordered an MRI and diagnosed a partial tear of the left knee ACL (R. 333, 338). In October 2007, Dr. Troy performed a ligament reconstruction for Mr. Real's left knee (R. 594, 597-600). Mr. Real also had surgery on his left shoulder in 2004, which continues to cause his shoulder to be painful, particularly with lifting over ten pounds (R. 643).

In late 2007 and early 2008, state agency physicians opined on Mr. Real's residual function capacity ("RFC") and his physical health. First, on August 29, 2007, Dr. Richard Bilinsky reviewed Mr. Real's then-available medical records and concluded that Mr. Real could occasionally lift 20 pounds, frequently lift 10 pounds; stand and/or walk at least two hours in an eight-hour work day; sit for a total of six hours in an eight-hour work day; never climb ladders, ropes or scaffolds; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl (R. 458-65). Second, Dr. M.S. Patil, a consulting physician for the Bureau of Disability Determination Services ("DDS"), examined Mr. Real on December 17, 2007, and completed an "Internal Medicine Consultative Examination" report (R. 642-46). The report noted some limitations in range of motion for Mr. Real's lumbar spine and both knees, some difficulty in walking on heels, toes, squatting, and getting on and off the table (R. 644-45). Dr. Patil found Mr. Real's mental status to be normal (R. 644). Finally, on January 11, 2008, a state agency physician, Dr. Francis Vincent, reviewed the medical evidence then in the file, along with Dr. Bilinsky's RFC opinion, and affirmed Dr. Bilinsky's August 29, 2007 RFC finding (R. 647-49).

After the state agency doctors reviewed the medical record, but before the administrative hearing in November 2009, Mr. Real continued to receive medical treatment. Medical records of his continued treatment were available to the ALJ, but not to the state agency physicians. The medical record from that time period contains numerous treatment notes from Pain Treatment Centers of Illinois and several months of treatment notes from Mr. Real's psychiatric treatment at Professional Health Associates, Ltd.

Mr. Real began treatment by doctors at Pain Treatment Centers of Illinois on October 21, 2008, when he was first seen by Dr. Donald Roland (R. 709). The record includes treatment notes from monthly, and sometimes more frequent, visits from October 2008 through right before the administrative hearing in November 2009 (R. 709-35). In October 2008, Dr. Roland ordered an MRI of Mr. Real's lumbar spine, which showed, among other things, "left foraminal stenosis at L4-L5 level which may impinge upon the exiting left L4 nerve root" (R. 712). The treatment notes reflect Mr. Real reporting constant, severe back pain, as well as shoulder and knee pain, despite treatment with nerve root blocks, opioid analgesics, adjunctive pain medication, Neurontin, and antidepressant medication, among other things (R. 709, 714, 716, 718, 720, 725, 730-32). On November 11, 2008, Dr. Roland gave Mr. Real an epidural steroid injection, and on April 3, 2009, Dr. Roland surgically implanted a spinal cord stimulator, which provided some measure of pain relief (R. 715, 727-29, 733, 734). Dr. Roland noted on May 26, 2009, that the spinal cord stimulator was working well and "takes ½ pain away" (R. 733), but on the same day stated that Mr. Real reported his pain level in the past 24 hours as 8 out of 10, having experienced pain at 10 out of 10 in the past week (*Id.*). Treatment notes from November 2008, June 2009, and November 2009 also reflect that Mr. Real reported trouble sleeping, so he was prescribed Trazodone in November 2009 (R. 714, 734, 735).

5

On March 2, 2009, Mr. Real was diagnosed as suffering from bipolar disorder by Dr. Wajid

Khan, a psychiatrist (R. 653-54). At that time, Dr. Khan rated Mr. Real's Global Assessment of

Functioning ("GAF") score at 50 to 60 (R. 654).[5] Mr. Real continued to seek treatment with Dr.

Khan from March through August 2009, and Dr. Khan recorded Mr. Real's symptoms as decreased

sleep, anger, racing thoughts, sadness, low energy, and lack of enjoyment of activities (R. 652-54,

678-80). Mr. Real also reported getting angry easily with his children and feeling agitated (R. 678).

Dr. Khan prescribed medications to help stabilize Mr. Real's moods (*Id.*).[6]

No consultative mental exam was ever performed, and no state agency doctor reviewed

Dr. Khan's treatment notes to provide an opinion regarding Mr. Real's mental impairment.

**B.**

At the administrative hearing, held on November 23, 2009, Mr. Real, who was represented

by counsel, testified on his own behalf (R. 9-33). He testified that he last worked on June 2, 2007,

because a few months after his back surgery, the pain increased to the point that he could no longer

work (R. 15-16). Mr. Real stated that he was currently under the care of Dr. Vasireddi Bhoopal, his

primary care physician, as well as Dr. Roland and another doctor at Pain Treatment Centers of

Illinois (R. 16). Dr. Roland had inserted a spinal cord stimulator (R. 17).

---

[5] The GAF scale is a "hypothetical continuum of mental health-illness" used to determine "psychological, social, and occupational functioning." *See* DSM–IV–TR at 32, 34. The GAF scale has 10 ranges of functioning with scores spanning from 0 to 100. *Id.* A score from 41 to 50 indicates serious symptoms including suicidal ideation or any serious impairment in social, occupational, or school function such as having no friends or an inability to keep a job. *Id.* at 34. A score from 51 to 60 indicates moderate symptoms like a flat affect, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning. *Id.*

[6] From March to August 2009, Mr. Real was prescribed several different medications, including Symbyax, Seroquel, and Lithium, in an effort to find a drug regimen that he could tolerate well (R. 652-54, 678-80, 692).

Mr. Real stated that his back pain is acute, constant, and radiates down his left leg, and that walking and lifting aggravates the pain (R. 19-20). He takes Percocet four times a day, which causes lack of focus, lack of sleep, and nausea (R. 20). The back pain causes difficulty sleeping, bending, stooping, walking, and sitting, and he cannot squat because of his knees (R. 19, 23). He also stated that he had gained 27 pounds in three months (R. 21).

Mr. Real testified that he uses a cane and recently walked three blocks and then had to rest for six hours (R. 22, 24). He estimated that he could stand for ten minutes, sit for 30 to 60 minutes, and lift ten pounds (R. 23, 25). During the day, Mr. Real cooks, and he watches his two small children (R. 28). He is able to attend school activities and can watch football on television with friends (R. 28-30).

Mr. Real said that in 2009, he sought therapy for bipolar disorder and depression (R. 30). He stated that on his bad days, he experiences apathy, anger, acute pain, complete lack of focus, and sleeplessness (R. 32). The lack of focus prevents him from being able to concentrate; he cannot concentrate well enough to read books (*Id.*)

The vocational expert ("VE") testified next (R. 34-43). The ALJ asked the VE which jobs would be available to an individual who has the same age, education, and work experience as Mr. Real, who has the residual functional capacity to perform light work and could: occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds (R. 35-36). The VE testified that such an individual could perform jobs, such as salesperson, which is classified as light and semi-skilled work, and that there are 105,926 jobs in Illinois that would meet these criteria (R. 36-37).

The ALJ then modified the hypothetical to add that the individual was limited to sedentary work, had to alternate from sitting to standing every two hours, and that he could stand for five to ten minutes (R. 37). The VE opined that there would be jobs as check cashier (25,310 jobs), credit card clerk (4,440 jobs), and insurance clerk (4,210 jobs) (R. 37-38).

The ALJ added further limitations, addressed to Mr. Real's bipolar disorder. She asked the VE to assume "in addition to the light work or sedentary, that the claimant has additional limitations, due to the bipolar disorder. He can understand, remember, and execute simple and detailed instructions. He can concentrate and persist adequately on tasks within an organized setting and can work at a consistent pace. He can have normal interactions with others, and the claimant can adjust to routine changes in his environment, as long as they are not too frequent" (R. 38). After listing these requirements, the ALJ asked the VE to identify unskilled, light, and sedentary occupations such an individual could perform (*Id.*) At the light level, the VE identified sales attendant (4,074 jobs), routing clerk (3,750 jobs), and cashier II (41,040 jobs) (*Id.*). At the sedentary level, the VE identified paramutual ticket checker (3,057 jobs), telephone quote clerk (3,902 jobs), and general office clerk (cutter/paster, and document preparer of microfilm) (4,971 jobs) (R. 38-39).

Next, the ALJ added a limitation to account for Mr. Real's pain – that the hypothetical individual would be off-task an additional five percent in addition to his regularly scheduled breaks (R. 39). The VE observed that this limitation would eliminate all but 2,105 insurance clerk jobs and 2,220 credit card clerk jobs (*Id.*). The VE also opined that a sit/stand option every two hours would not alter the number of jobs available at the sedentary work level (R. 41).

## C.

In her written opinion on December 9, 2009 (R. 51-62), the ALJ found that Mr. Real was not disabled under the Act (R. 61-62). In evaluating Mr. Real's claim, the ALJ applied the standard five-step sequential inquiry for determining disability, which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue,* 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, she must assess and make a finding about the claimant's residual functional capacity before moving on to Step 4. 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to his past work or different available work in the national economy. 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue,* 649 F.3d 565, 569 (7th Cir. 2011).

Here, the ALJ found, at Step 1, that Mr. Real had not engaged in substantial gainful activity since the alleged onset date (R. 53). At Step 2, the ALJ determined that the degenerative disc disease of the lumbar spine (a phrase the ALJ used to describe Mr. Real's back problems), left knee surgery, and bipolar disorder qualified as severe impairments (*Id.*). But she concluded that Mr. Real's additional reported impairments, including injury to his right knee, arthritis, neuropathy, fibromyalgia, diabetes, left shoulder surgery, and gastro-esophageal reflux disease, were not severe (*Id.*).

9

At Step 3, the ALJ found that Mr. Real does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 54). To meet Listing 1.04(A) (disorders of the spine), a claimant must present evidence of a spine disorder that results in compromise of a nerve root or the spinal cord with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). To meet Listing 1.04(C), a claimant must present evidence of "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(C). With respect to Listing 1.04, the ALJ concluded that though Mr. Real's medical records showed some stenosis, there was no definite nerve root impingement and insufficient evidence of an inability to ambulate effectively (R. 54).[7]

In addition, the ALJ found that Mr. Real's knee impairment did not meet or equal Listing 1.02 (major dysfunction of the joints), which sets out, in relevant part, the following requirements: "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

---

[7] The ALJ inverted the references, citing Listing 1.02 in analyzing Mr. Real's back impairment, and Listing 1.04 in analyzing his knee injury (R. 54).

With. . . Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. The ALJ determined that although Mr. Real had a ligament reconstruction for his left knee, he walked without crutches and "only" used a cane (R. 54). Consequently, he had not shown an inability to ambulate effectively and therefore his knee impairment did not meet or equal Listing 1.02 (*Id.*).

Finally, the ALJ concluded that Mr. Real's mental impairment did not meet or medically equal the criteria of Listing 12.04 (affective disorders). In making that finding, the ALJ determined that Mr. Real's mental impairment did not meet the "Paragraph B criteria"[8] because he had not shown two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration (R. 55). The ALJ found that Mr. Real had only mild restrictions in his activities of daily living ("ADLs"); moderate difficulties in social functioning; mild difficulties in concentration, persistence or pace; and no episodes of decompensation (R. 54-55).

The ALJ then analyzed Mr. Real's RFC, concluding that he could perform light work, as defined in 20 C.F.R. § 404.1567(b), except that:

> he can occasionally, climb ramps and stairs, and should never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. Additionally, the claimant can understand, remember, and execute simple and detailed instructions. The claimant can concentrate and persist adequately on tasks within an organized setting and can work at a consistent pace. The claimant can have normal interactions with others. The claimant can adjust to routine changes in his environment as long as they are not too frequent.

---

[8] The Paragraph B criteria, used to assess the severity of mental impairments, is satisfied when a claimant proves an impairment results in at least two of the following: marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. 20 C.F.R. Part 404, subpart. P, app. 1 § 12.04B; 20 C.F.R. § 404.1520a. If a claimant's degree of limitation in the first three criteria is rated as "none" or "mild" and "none" in the fourth criteria, it is generally concluded that a mental impairment is not severe. 20 C.F.R. § 404.1520a(d)(1).

(R. 55-56).[9] In making this finding, the ALJ concluded that Mr. Real's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but she discounted his statements concerning the intensity, persistence, and limiting effects of those symptoms (R. 57).

At Step 4, the ALJ determined that Mr. Real was unable to perform his past work as a furniture salesperson (R. 60). At Step 5, the ALJ found that there were a substantial number of jobs at the unskilled light and sedentary levels that Mr. Real could perform, so she concluded that he was not disabled under the Act (R. 60-61).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). The ALJ is not required to address every piece of evidence, but must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). If a decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," a remand is required. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

Mr. Real challenges a number of aspects of the ALJ's decision. We focus our discussion here on the argument that the ALJ failed to properly consider Mr. Real's bipolar disorder. We agree that this argument has sufficient merit to require a remand.

---

[9] Light work is defined as lifting no more than 20 pounds at a time with frequent lifting or carrying of up to 10 pounds and a "good deal" of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b). A "good deal" of walking or standing is described as doing so, off and on, for a total of approximately 6 hours of an 8-hour workday. SSR 83–10.

## A.

In addition to the general five-step analysis required to assess all disabilities, social security regulations require an ALJ to follow a "special technique" to assess mental impairments. *See* 20 C.F.R. §§ 404.1520a, 416.920a. This special technique is "used to analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations." *Craft*, 539 F.3d at 674. The special technique thus applies at Steps 2 and 3 of the five-step analysis. *Id.* (citing SSR 96-8p). If the claimant's "pertinent symptoms, signs, and laboratory findings" show that the claimant has a medically determinable impairment, the ALJ must then "rate the degree of functional limitation" in four broad areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1), 404.1520a(b)(2), (c)(3), 416.920a(b)(2), (c)(3). Courts refer to these functional areas as the "B criteria" or "paragraph B criteria." *See, e.g., Craft,* 539 F.3d at 674; *Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007).

The first three functional areas are rated on a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The fourth functional area – episodes of decompensation – is rated on a four-point scale of none, one or two, three, or four or more. *Id.* If the ALJ rates the first three areas as none or mild and the fourth area as none, then generally the impairment is not considered severe. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). If the claimant's mental impairment is considered severe at Step 2, the ALJ must determine at Step 3 whether the impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). If the claimant's mental impairment does not meet or exceed the

severity of any listing, the ALJ must then assess the claimant's RFC. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3).

The ALJ must document use of the technique; her "written decision must incorporate the pertinent findings and conclusions based on the technique." *Id.* §§ 404.1520a(e)(4), 416.920a(e)(4). Furthermore, "[t]he decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." *Id.*

**B.**

Here, the ALJ did not apply the special technique at Step 2 in determining that Mr. Real's bipolar disorder was severe. Rather, the ALJ, without analysis, found that Mr. Real's bipolar disorder was a severe impairment (R. 53). As in *Craft v. Astrue*, 538 F.3d at 674, the ALJ here jumped to the conclusion that the bipolar disorder was severe without first discussing Mr. Real's mental medical history or rating the four areas of limitation. Not surprisingly, Mr. Real does not challenge the ALJ's Step 2 analysis, though he does challenge the ALJ's consideration of his bipolar condition in assessing his RFC. Because Mr. Real did not raise this issue and because we find other errors require remand, we need not address whether this error was harmless. *See Craft*, 539 F.3d at 675 ("failure to explicitly use the special technique may indeed be harmless error").

**C.**

At Step 3, the ALJ did apply the B criteria to determine that Mr. Real's mental impairment did not meet or medically equal the criteria of Listing 12.04 (R. 54-55). In the category of activities of daily living, she found only mild restriction (*Id.*). In making this assessment, the ALJ noted that Mr. Real can cook, clean counters, and care for his young children, though he can no longer play

sports (R. 55). She also observed that at his December 17, 2007 consultative physical examination performed by Dr. Patil, Mr. Real did not report any mental impairment (R. 55, 642-46).

The ALJ found that Mr. Real suffered difficulties in social functioning resulting from "anger and frustration related to his physical problems," which she rated as "more than mild, but at most, moderate" (R. 55). Though she acknowledged that Mr. Real suffers from apathy and anger issues, the ALJ found that evidence somewhat offset by Mr. Real's testimony that he watches football with friends who visit his home (*Id.*)

In the third category – concentration, persistence, or pace – the ALJ rated Mr. Real's restriction as mild. Again, she relied on the December 2007 consultative exam in which Dr. Patil found Mr. Real's recent, remote, and immediate memory intact and his thinking and judgment normal (R. 55, 644). The ALJ also observed that although Mr. Real could not focus on reading a book, he could handle all of the cooking (R. 55).

Finally, in the last category – episodes of decompensation – the ALJ found that the record contained no episodes of decompensation (*Id.*). Because the ALJ determined that Mr. Real's mental impairment did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration, she concluded that the B criteria had not been satisfied, and consequently, that Mr. Real's mental impairment did not meet or medically equal the criteria of Listing 12.04 (R. 54-55).

The ALJ then proceeded to assess Mr. Real's RFC. With regard to Mr. Real's mental impairment, the ALJ incorporated "the degree of limitation" she "found in the 'paragraph B' mental function analysis" (R. 55). She found that the record did not "show any longitudinal psychiatric treatment consistent with more than mild to moderate limitations in his mental functioning but only

15

recent treatment with medication" (R. 59). Although the ALJ acknowledged treatment notes reporting anger at his children, she observed that those notes also reflected good appetite and sleep, in contrast to what Mr. Real later reported to his pain physician (*Id.*, citing R. 678; R. 658). The ALJ also reported that in one treatment note, Mr. Real's psychiatrist stated that Mr. Real had denied side effects of medication (*Id.*, citing R. 652). In addition, the ALJ considered the psychiatrist's report that rated Mr. Real's GAF score as between 50 and 60, observing that a "GAF score above 50 indicates only moderate psychological symptoms or any moderate difficulty in social, occupational, or school functioning" (*Id.*, citing R. 683).

After considering these additional factors, the ALJ determined that Mr. Real had only "mild to moderate mental deficits," and to account for those deficits, she limited his RFC to "unskilled work with routine changes in his environment as long as they are not too frequent" (*Id.*). Based on "the lack of evidence to the contrary," however, the ALJ found that Mr. Real's mental limitations did not interfere with his ability to sustain a consistent pace, to interact normally with others, or to understand simple as well as detailed instructions (*Id.*).

**D.**

Mr. Real contends that the ALJ improperly determined the functional limitations of his mental impairment and his resulting mental RFC (Pl.'s Br. at 6-10). We agree.

**1.**

The ALJ rated Mr. Real's mental functional limitations without the benefit of any medical professional's assessment of his mental RFC. Mr. Real filed for DIB on July 3, 2007, and underwent a consultative physical examination on December 17, 2007 (R. 177, 642-46). But he was not diagnosed with bipolar disorder until early 2009, when he sought and received psychiatric treatment

(R. 652-54, 678-83). Consequently, the ALJ did not have the assistance of any agency medical consultant in ascertaining the functional effects of Mr. Real's mental impairment.

The Seventh Circuit has highlighted the need for expert medical assistance in analyzing the functional limitations caused by mental impairments. In *Richards v. Astrue*, 370 F. App'x 727 (7th Cir. 2010), the Seventh Circuit vacated and remanded where the ALJ had failed to apply the special technique as required at Step 2 and had rated the claimant's mental functional limitations without any medical professional's assessment of the claimant's mental RFC. As in the present case, Richards's initial application did not assert a mental illness as impairing her employment prospects. *Id*. at 731. The court held that "an ALJ may not draw conclusions based on an undeveloped record and 'has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable.'" *Id.* (quoting *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004)). The court noted that one of the explicit goals of the special technique is to help the agency "'[i]dentify the need for additional evidence to determine impairment severity.'" *Richards*, 370 F. App'x at 731 (quoting 20 C.F.R. § 404.1520a(a)(1)). Consequently, in the absence of any "expert foundation" for the ALJ's assigned ratings, the court could not "discern the necessary logical bridge from the evidence to the ALJ's conclusions." *Id.*

An ALJ may not "play doctor" by making independent medical findings. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Mulac v. Astrue*, No. 11-C-1887, 2012 WL 3308811, at *10 (N.D. Ill. August 10, 2012). In addition, it is an ALJ's responsibility to recognize the need for further medical evaluations of a claimant's conditions before making RFC and disability determinations. *See Scott v. Astrue,* 647 F.3d 734, 741 (7th Cir. 2011); *Barnett*, 381 F.3d at 669; *Golembiewski v. Barnhart,* 322 F.3d 912,

918 (7th Cir. 2003); *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000). Here, in the absence of any

consultative or treating psychiatrist opinion on Mr. Real's mental functional limitations, the ALJ

applied the special technique and impermissibly reached her own independent medical conclusion

about the severity of his mental impairment. *See, e.g., Myles,* 582 F.3d at 677 (ALJ may not draw

own unsupported medical inferences); *see also Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.

1990) ("Common sense can mislead; lay intuitions about medical phenomena are often wrong.").

Moreover, she made her own findings about the severity of Mr. Real's mental impairments: "He

testified that he takes medication and has conversations with his psychiatrist, but overall his

testimony revealed claimant's depression was minimal" (R. 60). We conclude that in applying the

special technique and determining the effects of Mr. Real's bipolar disorder without the benefit of

any medical opinion, the ALJ failed to create an accurate and logical bridge from the evidence to her

conclusions.

**2.**

The ALJ's analysis also displays a misunderstanding of mental illness. In several instances,

the ALJ singled out isolated treatment notes to undermine Mr. Real's claims. For example, the ALJ

stated that Mr. Real "testified that he had problems sleeping and reported the same to his primary

care doctor who referred him to a psychiatrist; however treating records from his psychiatrist on

August 3, 2009 noted that claimant's sleep and appetite are good" (R. 60). The medical record,

however, contains numerous references to Mr. Real's difficulties with sleeping both before and after

that date (R. 255, 260, 612, 655, 658, 735). The ALJ also remarked upon a March 23, 2009

psychiatric treatment note reflecting that Mr. Real had denied side effects of medication (R. 59 citing

R. 652), but she did not acknowledge that in the next treatment note, Mr. Real reported difficulty with another medication, which gave him nightmares (R. 680).

The Seventh Circuit has repeatedly exhorted ALJs not to rely upon a single "snapshot" in time of a claimant's mental illness or isolated comments from treatment notes. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition") (collecting cases); *see also Scott*, 647 F.3d at 740 ("people with the disease experience fluctuations in their symptoms"); *Phillips v. Astrue*, 413 Fed. App'x 878, 886 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *see also Hunt v. Astrue*, No. 12-C-46, 2012 WL 3779193, at *11 (E.D. Wis. August 31, 2012). The ALJ here failed to follow this direction from the Seventh Circuit, and failed to confront the totality of the evidence concerning Mr. Real's mental health condition. That shortcoming requires remand.

### 3.

Even assuming the ALJ's Paragraph B findings were proper, she did not adequately account for those functional limitations in Mr. Real's RFC. In explaining the effect of Mr. Real's bipolar disorder on the RFC, the ALJ found that "[b]ecause the record establishes claimant only has mild to moderate mental deficits, I have provided that he is limited to unskilled work with routine changes in his environment as long as they are not too frequent" (R. 59). Nevertheless, the ALJ also concluded that Mr. Real "can understand, remember, and execute simple and detailed instructions. He can concentrate and persist adequately on tasks within an organized setting and can work at a consistent pace. He can have normal interactions with others" (R. 38; R. 59). The ALJ does not square her finding of mild to moderate social difficulties with her hypothetical to the VE, which

includes that Mr. Real can have "normal interactions" with others (R. 38). Evidence in the record shows that Mr. Real struggles with angry outbursts (R. 625, 678). Indeed, the ALJ emphasized that Mr. Real had unsuccessfully sought a treating source opinion from a pain physician, Dr. Parameswar, "to whom he was apparently very rude" (R. 59).[10] Mr. Real's belligerent behavior is consistent with his mental illness and further underscores his social difficulties.

Neither the RFC, nor the limitations in the hypotheticals to the VE, accounted for Mr. Real's potential for angry, rude behavior in the workplace. This omission could have affected the analysis at Step 5. *See O'Connor-Spinner*, 627 F.3d at 621 ("even a moderate limitation on responding appropriately to supervisors may undermine seriously a claimant's ability to work") (citing 20 C.F.R. § 404.1545(c); SSR 85-15).

Moreover, for the same reason the ALJ's Paragraph B analysis was deficient – lacking expert medical input – the mental RFC finding cannot stand. The ALJ did not identify any medical evidence that Mr. Real is capable of performing the mental demands of unskilled work except for frequent changes in the work environment. *See Scott*, 647 F.3d at 740 (the ALJ needed to explain how she reached her conclusions about claimant's capabilities). The Seventh Circuit has repeatedly held that simply adding "unskilled work" to the RFC is insufficient to address the impact of problems of concentration, persistence, and pace. *See, e.g., O'Connor-Spinner*, 627 F.3d at 620 (collecting cases); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (per curiam) (EAJA case awarding fees, collecting cases from other circuits); *see also* SSR 85-15 ("A claimant's [mental]

_____

[10] The ALJ is presumably referring to Mr. Real's angry exchange with Dr. Parameswar on October 18, 2006 (R. 625).

condition may make performance of an unskilled job as difficult as an objectively more demanding job."). Consequently, substantial evidence does not support the ALJ's mental RFC.

On remand, the Court expects the agency to reevaluate Mr. Real's mental limitations and residual functional capacity with the benefit of an expert opinion.

## CONCLUSION

For all foregoing reasons, plaintiff's motion for reversal and remand is granted. The case is remanded for further proceedings consistent with this ruling. The case is terminated.[11]

**ENTER:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated: December 18, 2012**

---

[11] In light of our decision to remand on the basis set forth above, we need not address the other arguments for reversal or remand raised in plaintiff's motion. That said, in light of the remand to reevaluate Mr. Real's mental limitations and residual functional capacity with the benefit of an expert opinion, the ALJ must also reassess whether Mr. Real's mental and physical impairments meet or exceed a listed impairment. In addition, we encourage the ALJ to carefully analyze Mr. Real's claims of chronic, debilitating pain and the effects of Mr. Real's strong pain medications in terms of his credibility and his residual functional capacity. *See Parker v. Astrue*, 597 F.3d 920, 921-23 (7th Cir. 2010). Because the ALJ will need to revisit her RFC determination, she can evaluate whether Mr. Real is limited to sedentary work, rather than light work, based on the DDS RFC assessment.